Arnease LUDLEY, Plaintiff,

v.

BOARD OF SUPERVISORS OF L. S. U., etc., et al., Defendants.

Jack BAILEY et al., Plaintiffs,

v.

LOUISIANA STATE BOARD OF EDUCATION et al., Defendants.

Alma LARK et al., Plaintiffs,

v.

LOUISIANA STATE BOARD OF EDUCATION et al., Defendants.

Civ. A. Nos. 1833, 1836, 1837.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

April 15, 1957.

A. P. Tureaud, New Orleans, La., Robert L. Carter, New York City, for plaintiffs.

L. W. Brooks, Jack Gremillion, Baton Rouge, La., George Ponder, New Orleans, La., for defendants.

Before CHRISTENBERRY, Chief Judge, and WRIGHT, District Judge.

J. SKELLY WRIGHT, District Judge.

■ This litigation concerns another attempt by the Louisiana Legislature to preserve, by law, segregation in the educational institutions of the state. This attempt, while more subtle than its predecessor,[1] nevertheless fails because the Fourteenth Amendment of the Constitution "nullifies sophisticated as well as simple-minded modes of discrimination." Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281.

The plaintiffs in these three class actions[2] are now attending various state institutions of higher learning in Louisiana under temporary restraining orders issued by this court.[3] The authorities of these institutions had indicated that the plaintiffs, and all Negroes similarly situated, would be refused registration unless they presented the certificate of eligibility and good moral character signed by their former principals and

---

1. See Bush v. Orleans Parish School Board, D.C., 138 F.Supp. 336, 337, affirmed 5 Cir., 242 F.2d 156; Id., 351 U.S. 948, 76 S.Ct. 854, 100 L.Ed. 1472.

2. The jurisdiction of this court is invoked under Section 1331, Title 28 United States Code, this being an action that arises under the Fourteenth Amendment of the Constitution of the United States, Section 1, and Section 1981 of Title 42 United States Code, wherein the matters in controversy exceed the sum and value of $3,000, exclusive of interest and costs.

The jurisdiction of the court is also invoked under Section 1343, Title 28 United States Code, this being an action authorized by Section 1983, Title 42 United States Code, to be commenced by any citizen of the United States, or other person within the jurisdiction thereof, to redress the deprivation, under color of a state law, statute, ordinance, regulation, custom or usage, of rights, privileges and immunities secured by the Fourteenth Amendment of the Constitution of the United States, Section 1 and Section 1981 of Title 42 United States Code, which provides for the equal rights of citizens and all persons within the jurisdiction of the United States.

3. It is apparently admitted that the original plaintiff in No. 1833 is now unable to continue at Louisiana State University because of academic difficulties. She maintained a point-hour ratio of 1.3 as against the required point-ratio of 1.5. After the hearing on preliminary injunction, three additional Negro students moved to intervene as parties plaintiff in that action, and their motion to intervene was granted. Since these intervenors were before the court from the inception of this class action because of their being members of the class, and in view of the disposition by this court in Nos. 1836 and 1837 of the identical issues raised in No. 1833, no useful purpose would be served by a second hearing on the application for preliminary injunction in No. 1833.

superintendents as required by Act 15 of 1956 [4] of the Louisiana Legislature. Plaintiffs have been unable to obtain the certificate because Act 249 of 1956 [5] by the same legislature provides, in effect, that the principals and superintendents will lose their jobs if they sign the certificates.

Plaintiffs, in these proceedings seeking declaratory judgments and injunctive relief, attack the constitutionality of Act 15 of 1956 as well as Act 249 of the same year. Act 15, in pertinent part, provides that "No person shall be registered at or admitted to any publicly financed institution of higher learning of this state unless he or she shall have first filed with said institution a certificate addressed to the particular institution sought to be entered attesting to his or her eligibility and good moral character." The certificate "must be signed by the Superintendent of Education of the Parish, County, or Municipality wherein said applicant graduated from High School, and by the principal of the High School from which he graduated." Act 249 of 1956, in pertinent part, provides that "A permanent teacher shall not be removed from office except upon written and signed charges of * * * advocating or in any manner performing any act toward bringing about integration of the races within the public school system or any public institution of higher learning of the State of Louisiana * * *." Plaintiffs contend that it was the plan of the Louisiana Legislature in passing Acts 15 and 249 of 1956 to prevent the registration of Negroes at institutions designated by it as exclusively for white students by jeopardizing the job of any principal or superintendent who certified eligibility of any Negroes for such institutions.

■ Defendants contend that Acts 15 and 249 of 1956 are entirely unrelated and must be considered separately. They admit that while there may be some question as to the constitutionality of Act 249, they earnestly contend that there can be no question as to Act 15, which, they say, merely requires a certificate of good character before a student may enter an institution of higher learning in the state. Defendants have also moved to dismiss on the grounds that the case is one for three judges and that the defendants, being state agencies, are immune from suit. These latter contentions were rejected in Bush v. Orleans Parish School Board, 138 F.Supp. 336, 337, affirmed 5 Cir., 242 F.2d 156; Id., 351 U.S. 948, 76 S.Ct. 854,[6] and need not be considered further here.

Since the constitutionality of the two statutes in suit will depend, at least to some extent, on the intention of the Legislature which enacted them, we turn to that consideration. The Louisiana Legislature at its regular session in 1956, without a dissenting vote in either the Senate or House of Representatives, passed thirteen acts designed to maintain separation of the races in schools, in parks and playgrounds, in athletic events, in toilet, eating and drinking facilities, and in waiting rooms for passengers in intrastate commerce. Two of the measures proposed amendments to the State Constitution, the first preventing suits against agencies of the state, such as school boards, without consent of the Legislature, and the second proposing various barriers to voting registration.

This segregation legislation was sponsored by the Joint Legislative Committee on segregation. This Committee was supported during the fiscal year 1955–56 on moneys received from the Board of Liquidation of the State Debt. In his application to the Board for the allotment of the money for the Committee, the Chairman of the Joint Legislative Committee wrote:

"Although we have strong laws upon our books which will enable the

---

4. LSA–R.S. 17:2131–35.

5. LSA–R.S. 17:443.

6. The action by the Supreme Court was limited to denial of application for writ of mandamus requiring the convention of a three-judge court.

State of Louisiana to make a very strong fight for separation of the races in our public schools, the greater part of our work still lies ahead of us. This committee must aid in coordinating the state's defense of its official policy of segregation, and we must also make studies of every legal and social attack made upon the state's policy in order to formulate any additional legislation that may be needed to preserve, affirm and extend this policy." (Resolution No. VII, Appropriation No. V, Board of Liquidation of the State Debt, July 7, 1955.)

In addition to this statement by the Chairman of Joint Legislative Committee on segregation, respecting the purpose of segregation legislation generally, there are various other statements[7] referred to in 17 La.L.Rev. 112, indicating that the specific purpose of the two acts in suit is to prevent the registration of Negroes at institutions of higher learning in the state designated as exclusively for white students. These statements show beyond question that it was the intention of the Legislature that any teacher who signs a certificate for a Negro student to go to a white school will sacrifice his tenure.

The legislation has operated in practice pursuant to the intentions of its authors. Not a single principal of a public school or superintendent of a public school system has signed a certificate for a Negro to go to a white school. The combined effect, therefore, of the legislation in suit, Acts 15 and 249 of 1956, is the same as if the Legislature had simply provided, as it did in 1954, "All public * * * schools in the State of Louisiana shall be operated separately for white and colored children."[8] The fact that a transparent device is used, calculated to effect this same result, does

not make the legislation less unconstitutional. Lane v. Wilson, supra; Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340.

The defendants' earnest suggestion that, irrespective of the constitutionality of Act 249, Act 15 of 1956, merely requiring a certificate of good character for admission to a state institution of higher learning is not unconstitutional, is also without merit. Act 15 does not merely require a certificate of good character. It requires a certificate of good character addressed to the particular institution sought to be entered. Addressing a certificate of good character for a Negro to a particular institution, a white institution for example, jeopardizes the job of the principal or superintendent addressing the certificate. Thus Acts 15 and 249 are integrally related. They are both part of the same transparent device. Moreover, the requirement in Act 15 that the certificate be signed by both the principal of the school and the superintendent of education makes assurance doubly sure that no Negro will be able to obtain such a certificate. If, for example, a Negro graduate of a parochial school were successful in obtaining the signature of the principal of his school, such principal not being subject to the state's tenure law, the signature of the parish superintendent of education would still be unavailable because his position would be jeopardized by his signing.

This scheme of dividing discriminatory legislation into two separate acts, one apparently innocuous, was used by the 1954 Louisiana Legislature and was condemned in Bush v. Orleans Parish School Board, supra. Cf. Davis v. Schnell, D.C., 81 F.Supp. 872, affirmed 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093. There a statute,[9] apparently valid on its face,

---

7. There is no legislative history, such as copies of committee reports and floor debates, available on the legislation in suit. The intention of the legislators, however, has been publicly proclaimed again and again.

8. Act 555 of 1954, LSA–R.S. 17:331.

9. Act 556 of 1954, LSA–R.S. 17:81.1, in pertinent part, provided:
   "Each Parish Superintendent of Schools, throughout this State, shall, each year, determine the particular pub-

became unconstitutional when applied in tandem with discriminatory legislation.[10] Even considered alone and without reference to Act 249, Act 15 would still be unconstitutional for the reason that the obvious intent of the Legislature in passing the Act was to discriminate against Negro citizens and thus to circumvent the Equal Protection Clause of the Fourteenth Amendment. See Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220; Davis v. Schnell, supra.

Decree to be drawn by the court.

lic school within each Parish to be attended by each school child applying for admission to public schools. No school child shall be entitled to be enrolled or to enter into a public school until he has been assigned thereto in accordance with the provisions of this Act."

10. Act 555 of 1954, in pertinent part, provided:

"All public elementary and secondary schools in the State of Louisiana shall be operated separately for white and colored children. This provision is made in the exercise of the State police power to promote and protect public health, morals, better education and the peace and good order in the State and not because of race."